## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| IPSEN BIOPHARMACEUTICALS, INC.<br>106 Allen Rd.<br>Basking Ridge, NJ 07920 | )<br>)<br>) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| SYLVIA BURWELL, in her official capacity as<br>Secretary of the United States Department of Health<br>& Human Services<br>Hubert H. Humphrey Building<br>200 Independence Avenue, SW<br>Washington, DC 20201 | )<br>) Case No. 1:16-cv-02372<br>)<br>)<br>)<br>) |
| | ) |
| ANDY SLAVITT, in his official capacity as Acting<br>Administrator of the Centers for Medicare &<br>Medicaid Services<br>Hubert H. Humphrey Building<br>200 Independence Ave., SW<br>Washington, DC 20201 | )<br>)<br>)<br>)<br>)<br>) |
| | ) |
| UNITED STATES DEPARTMENT OF HEALTH<br>AND HUMAN SERVICES,<br>Hubert H. Humphrey Building<br>200 Independence Ave., SW<br>Washington, DC 20201 | )<br>)<br>)<br>)<br>) |
| | ) |
| CENTERS FOR MEDICARE & MEDICAID<br>SERVICES<br>Hubert H. Humphrey Building<br>200 Independence Ave., SW<br>Washington, DC 20201 | )<br>)<br>)<br>)<br>) |
| | )<br>) |
| Defendants. | )<br>) |
| | ) |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiff Ipsen Biopharmaceuticals, Inc. ("Ipsen") seeks declaratory and injunctive relief against Defendants Sylvia Burwell, Andy Slavitt, the United States Department of Health and Human Services ("HHS"), and the Centers for Medicare & Medicaid Services ("CMS"), stating as follows:

## INTRODUCTION

1.      In violation of the applicable statutory provisions as well as the requirement of reasoned agency decisionmaking, CMS determined that, for purposes of the Medicaid drug rebate program, Ipsen's Somatuline Depot with Enhanced Device ("Somatuline ED") is the same drug as a predecessor product, even though Somatuline ED required approval as a "new drug" from the Food and Drug Administration ("FDA") and in fact received "new drug exclusivity" from FDA in recognition of its innovative therapeutic benefits, distinct from those of the predecessor product.

2.      Ipsen spent more than $80 million over several years to make significant and distinguishing improvements to its predecessor product, including by developing clinical data demonstrating Somatuline ED's safety and effectiveness in treating patients with certain cancerous neuroendocrine tumors.  The predecessor product was approved by FDA to treat only acromegaly, an entirely different condition.  This new therapeutic use of Somatuline ED and the significant improvements Ipsen made to the delivery mechanism for the drug were "major changes" under FDA regulations and thus rendered the new product a "new drug" requiring a new approval from FDA.  As authorized under the Food, Drug and Cosmetic Act ("FDCA") and as is common practice, Ipsen sought the required approval by submitting "supplements" to its existing, approved new drug application ("NDA") rather than by submitting an entirely new, standalone NDA.

3.      After receiving FDA approval for Somatuline ED and being awarded a three-year period of "new drug exclusivity" for its efforts, Ipsen sought CMS's approval to treat Somatuline ED as a new drug product for purposes of calculating the rebates that drug manufacturers are required to pay to state Medicaid programs.  Approval should have been straightforward:  CMS and FDA sit alongside each other within HHS and administer programs involving the same regulated actors.  It would be odd for Congress to intend sister agencies within HHS to apply conflicting standards for when a significantly modified product qualifies as a new drug.  And it would be even odder for Congress to authorize CMS to create such a conflicting regime without any statutory direction to do so or any guidance about what that conflicting regime should look like.  Far from containing any suggestion that CMS create its own regime for this purpose, the Social Security Act ("SSA") provisions governing the Medicaid drug rebate program expressly and repeatedly reference the FDCA's drug approval provisions, confirming Congress's intent that CMS rely on the FDCA regime when determining when a significantly modified product qualifies as a new drug.

4.      CMS, however, rejected Ipsen's request, adopting a legal rule that conflicts with the FDCA framework and is unsupported by anything in the SSA.  Specifically, CMS stated that, in its view, modified drug products—no matter the significance of the modifications, and even where, as here, the modifications render the new product a "new drug" under the FDCA—are the same drug as the predecessor product if they are approved by FDA through supplements to an existing, approved NDA rather than through a new NDA.

5.      CMS's interpretation has never been the subject of notice-and-comment rulemaking or otherwise been publicly articulated, and CMS offered no explanation of why it discarded the FDCA drug approval regime and adopted its own, contrary legal position.

6. CMS's determination is arbitrary and capricious, an abuse of discretion, and not in accordance with law.

7. This Court should declare that Somatuline ED is a new and different drug product from Ipsen's predecessor product for purposes of the Medicaid drug rebate program and set aside CMS's determination to the contrary.

## THE PARTIES

8. Ipsen Biopharmaceuticals, Inc. is a Delaware corporation with its principal place of business in New Jersey.  Ipsen specializes in the development and manufacturing of innovative pharmaceutical products.

9. Defendant Sylvia Burwell is the United States Secretary of Health and Human Services and is sued solely in her official capacity.

10. Defendant Andy Slavitt is the Acting Administrator of the Centers for Medicare & Medicaid Services and is sued solely in his official capacity.

11. Defendant HHS is an executive department of the United States Government. HHS is headquartered in Washington, D.C.

12. Defendant CMS is the federal agency to which Secretary Burwell has delegated the authority pursuant to the Social Security Act to administer the Medicaid program.

## JURISDICTION AND VENUE

13. This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 because Ipsen's claim arises under the laws of the United States.

14. Venue is proper in this district under 28 U.S.C. § 1391 because Defendants reside in the District of Columbia and a substantial part of the events giving rise to this action occurred in this district.

15.     An actual controversy exists between the parties under 28 U.S.C. § 2201, and this Court has authority to grant the requested declaratory and injunctive relief under 28 U.S.C. §§ 2201 & 2202 and the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 705 & 706.

## STATUTORY AND REGULATORY FRAMEWORK

### A.  THE MEDICAID DRUG REBATE PROGRAM

16.     The Medicaid Drug Rebate Program ("MDRP"), as authorized by Section 1927 of the SSA, requires drug manufacturers to enter into a national rebate agreement with HHS and pay rebates to state Medicaid programs as a condition of Medicaid coverage of the manufacturer's covered outpatient drugs.

17.     For single-source (*i.e.*, innovator) drugs such as Somatuline ED, the statute specifies that there are two basic components of the unit rebate amount payable by participating manufacturers to state Medicaid programs:  the basic rebate and the additional rebate.  42 U.S.C. § 1396r-8(c).  For the vast majority of drugs, including Somatuline ED, the basic rebate is the greater of:  (a) the difference between the product's Average Manufacturer Price ("AMP") and its Best Price, as those terms are defined by statute and CMS regulations; and (b) 23.1% of the product's AMP.  *Id.* § 1396r-8(c)(1).

18.     The additional rebate is based on the amount by which the AMP "for the dosage form and strength of the drug" for the current quarter exceeds the AMP "for the dosage form and strength of the drug" for the first full calendar quarter after the day on which the product was first approved and marketed (known as the "base date AMP"), as adjusted for inflation over that same period.  *Id.* § 1396r-8(c)(2).  In other words, the additional rebate serves to require manufacturers to pay increased rebates where price increases for their products outpace inflation.

19.     Based on this statutory framework, the rebate calculation hinges on whether a product is a distinct "drug" as well as on its dosage forms and strengths.  As particularly relevant here, the base date AMP derived from when a "drug" is first marketed is an important component of the additional rebate calculation.

20.     The Social Security Act provisions governing the Medicaid rebate program do not contain their own independent definition of what constitutes a distinct "drug" for purposes of that program.   Rather, they define a "covered outpatient drug" for purposes of the MDRP by reference to the FDCA's drug approval provisions.  This demonstrates Congress's intent that, in administering the MDRP, CMS rely on the drug classification and approval framework already established under the FDCA.

21.     Section 1927(k)(2) of the SSA defines "covered outpatient drug" in relevant part as a "drug which may be dispensed only upon prescription" and "which is approved for safety and effectiveness as a prescription drug under section 505 or 507 of the [FDCA] or which is approved under section 505(j) of such Act" or that qualifies as a grandfathered unapproved drug under the FDCA.  42 U.S.C. § 1396r-8(k)(2).  Thus, the statute governing the MDRP defines "covered outpatient drug" as an FDA-approved prescription drug or a grandfathered unapproved drug—classifications that turn on the provisions of the FDCA.

22.     Further confirming Congress's intent, a "single source drug" is defined under the SSA as "a covered outpatient drug which is produced or distributed under an original new drug application approved by [FDA]."  *Id.* § 1396r-8(k)(7)(iv).  New drug applications, commonly known as "NDAs," are submitted to obtain approval to market innovator, or brand-name, drugs; abbreviated new drug applications, or "ANDAs," are submitted to obtain approval to market generic drugs.

23.     Like the Medicaid drug rebate statutory provisions, CMS's regulations do not contain a separate definition of the term "drug," but rather define "covered outpatient drug" and "single source drug" by reference to the FDCA.  *See* 42 C.F.R. § 447.502.

**B.  FDCA FRAMEWORK FOR DEFINING A "NEW DRUG"**

24.     The FDCA contains a well-defined framework for new drugs, including where modifications to a predecessor drug product render it a "new drug" requiring a new approval.

25.     Under the FDCA, whether a product constitutes a "new drug" depends on its chemical composition as well as the data supporting its safety and efficacy for an intended use.

26.     Section 201(p) of the FDCA defines a "new drug" in relevant part as "[a]ny drug . . . the composition of which is such that such drug is not generally recognized, among experts qualified by scientific training and experience to evaluate the safety and effectiveness of drugs, as safe and effective for use under the conditions prescribed, recommended, or suggested in the labeling thereof."  21 U.S.C. § 321(p).

27.     A new drug may not be introduced into interstate commerce unless it is the subject of an application that FDA has approved.  21 U.S.C. § 355(a); *see also* 21 U.S.C. § 331(d).

28.     If a manufacturer makes certain changes to an FDA-approved drug product or to its conditions of use (*i.e.*, the "conditions prescribed, recommended, or suggested in the labeling"), the product is a "new drug" as a matter of law.  *See, e.g.,* 21 C.F.R. § 314.70(b).

29.     A manufacturer must submit supplemental information to substantiate the safety and effectiveness of the proposed changes and obtain a new and separate FDA approval before it may sell a "new drug."  *Id.*  If a manufacturer begins selling such a new drug without obtaining a new approval from FDA, it is subject to criminal and civil enforcement action.

30.     A manufacturer may seek FDA approval for changes to an approved drug in two ways:  (a) by submitting a new NDA; or (b) by submitting a supplement to its existing, approved NDA (commonly referred to as an "sNDA").  *See* 21 U.S.C. § 356a; Guidance for Industry: Submitting Separate Marketing Applications and Clinical Data for Purposes of Assessing User Fees (Dec. 2004) (specifying the circumstances when an sNDA rather than a new NDA is generally appropriate).  With the exception of changes to a dosage form or route of administration of an existing drug product, manufacturers generally do not submit new NDAs when making changes to their products that require FDA approval as new drugs.  Rather, as a matter of efficiency for both manufacturers and FDA, manufacturers generally submit sNDAs to obtain the required approval.

31.     If a company other than the original sponsor proposes changes to an approved drug product, it must submit a new NDA rather than an sNDA.  21 U.S.C. § 355(b)(2); 21 C.F.R. § 314.54; Draft Guidance for Industry: Applications Covered by Section 505(b)(2) (Oct. 1999).

32.     As specified in 21 C.F.R. § 314.70(b), an applicant must notify FDA about "each change in each condition established in an approved application beyond the variations already provided for in the application."

33.     As relevant here, when changes are "major changes" (*i.e.*, a change in the drug substance, drug product, intended use, production process, quality controls, equipment, or facilities that has a "substantial potential" for an adverse effect on the "identity, strength, quality, purity, or potency" of a product), an sNDA (or NDA) must be submitted and FDA approval obtained before the modified drug may be marketed.

34.     If a manufacturer were to market a drug with any such major changes before receiving FDA approval, it would be guilty of marketing an unapproved new drug.  21 U.S.C. § 355(a); 21 C.F.R. § 314.70(b).

35.     Certain types of changes that require FDA approval through submission of an sNDA (or NDA) can qualify the drug product for "new drug exclusivity," which is a period of time during which FDA will not approve a competitor product with the same formulation and conditions of use.  *See* 21 C.F.R. § 314.108.

36.     Not every sNDA qualifies a drug for exclusivity.  Among the specified grants of exclusivity, the FDCA grants three years of new drug marketing exclusivity to a product when an sNDA (or NDA) "[c]ontain[s] reports of new clinical investigations (other than bioavailability studies) that were conducted or sponsored by the applicant that were essential to the approval of the supplemental [application]."  21 C.F.R. § 314.108(b)(5).

37.     In addition, FDA has recognized that modifications in a drug's indication, active ingredient, strength, dosage form, route of administration, or conditions of use typically qualify the drug for a grant of exclusivity.  59 Fed. Reg. 50,386 (Oct. 3, 1994).

38.     In the event that an sNDA (or NDA) seeks approval to market a drug for a new indication treating a rare disease or condition, the drug can also qualify for orphan drug exclusivity, which prevents approval of any application for the same active ingredient for the same indication for seven years.  *See* 31 U.S.C. § 360cc; 21 C.F.R. Part 316.

39.     As evidenced by these provisions, drug products that qualify for new drug exclusivity are viewed by Congress and FDA as new drugs for fundamental legal, regulatory, and policy purposes.  New drug exclusivity does not apply if the manufacturer makes only minor

changes to a product.  Rather, it applies only if the manufacturer has made a major investment to improve its product in a way that Congress sought to specifically incentivize.

## FACTUAL BACKGROUND

A.    **FDA APPROVALS OF SOMATULINE PRODUCTS**

40.    On August 30, 2007, FDA approved Ipsen's NDA for its Somatuline Depot drug product, an injectable in three strengths (60 mg, 90 mg, and 120 mg).

41.    The original approved indication for Somatuline was for acromegaly—a condition involving excessive growth of the hands, feet, and face as a result of excessive growth hormone production during adulthood.

42.    Between 2010 and 2014, Ipsen conducted extensive and costly research to support significant improvements to its Somatuline product.

43.    On October 28, 2014, FDA approved Ipsen's sNDA for its new drug product, Somatuline Depot with Enhanced Device, in three strengths (60 mg, 90 mg, and 120 mg). Somatuline ED reflected significant changes from the predecessor product.

44.    Specifically, FDA approved changes in the drug's inactive ingredients and manufacturing processes and a complete redesign of the delivery device, including modifications to the drug product container-closure system (*e.g.*, adding a sharps-protection system to the syringe to help prevent needle-stick injury and harmonizing the syringe dimensions for the three dosage strengths), as well as corresponding revisions to the labeling and healthcare provider instructions for use.

45.    In support of its sNDA, Ipsen submitted four major user studies, conducted over four years, that demonstrated the safety and efficacy of the new syringe design.  Along with providing automatic needle protection, the new syringe design ensures that patients receive a full

dose of Somatuline ED with each injection.   Ipsen also removed latex from the syringe, providing additional safety improvements.

46.      An NDC-9 is a nine-digit code that identifies each distinct drug product in the marketplace.   The first five digits designate the labeler, *i.e.*, Ipsen.   The last four digits designate the product.   Because of the significance of the changes from the predecessor product to Somatuline ED, Ipsen assigned a new product code for its Somatuline ED products.   The three strengths of Somatuline ED thus have a different NDC-9 from the corresponding strengths of the predecessor product.

47.      On December 16, 2014, FDA approved another sNDA for Somatuline ED, this time for a new indication based on the results submitted by Ipsen of an $80 million multicenter, randomized double-blind, placebo-controlled efficacy trial involving 204 patients.

48.      The new indication, as set forth in the FDA-approved prescribing information for the drug, is for "the treatment of patients with unresectable well- or moderately-differentiated, locally advanced or metastatic gastroenteropancreatic and neuroendocrine tumors ('GEP-NETS') to improve progression-free survival."   Somatuline ED is the first drug approved by FDA for this indication, providing oncology patients with access to an important new therapy.

49.      Somatuline ED earned three years of "new drug exclusivity" under the FDCA in recognition of this new indication and the fact that it was supported by the new clinical data in the sNDA.   *See* 21 U.S.C. §§ 505(c)(3)(E)(iii), (iv); 59 Fed. Reg. 50,386 (Oct. 3, 1994).

50.      In addition, because the new indication is to treat patients with a rare disease or condition, Somatuline ED earned orphan drug exclusivity under the FDCA.   *See* 31 U.S.C. § 360cc; 21 C.F.R. Part 316.

51.     Ipsen could have obtained FDA approval to market the new Somatuline ED products either by submitting a new NDA or (as Ipsen in fact did) by submitting an sNDA.  FDA often encourages manufacturers to submit sNDAs rather than new NDAs for efficiency reasons, and it is common in the industry for manufacturers to proceed via sNDA when seeking FDA approval to market "new drugs" reflecting major changes from a predecessor product.

52.     Based on information and belief, Ipsen alleges that other manufacturers making major changes to drug products comparable to those reflected in Somatuline ED have proceeded via a new NDA rather than via an sNDA, which under CMS's reasoning would entitle those manufacturers (unlike Ipsen) to a new base date AMP for their new drug product.

**B.      CMS DENIAL OF NEW BASE DATE AMPS**

53.     After Somatuline ED was approved for marketing by FDA, Ipsen wrote to CMS on January 7, 2015, informing the agency of its intent to establish base date AMPs for purposes of the MDRP for the three Somatuline ED strengths by reference to the first full quarter after the new products were launched (2Q 2015), rather than treating the new product as the same drug as the predecessor product and using the base date AMPs that applied to the predecessor product.

54.     In January 2015, Ipsen began marketing Somatuline ED.  Ipsen soon thereafter removed the predecessor product from the market.

55.     On July 2, 2015, CMS responded to Ipsen's letter in an email from Wendy Tuttle, a Health Insurance Specialist in the Pharmacy Division of the Center for Medicaid and CHIP Services within CMS.  The agency rejected Ipsen's position that it is entitled to establish new base date AMPs for its Somatuline ED products, asserting that "the baseline data for the[] three NDCs [of Somatuline ED] must be changed to reflect the original baseline data of Somatuline Depot," including the base date AMPs for the predecessor product.

56.     CMS's analysis focused on the fact that Somatuline ED has the same dosage form and strengths as the predecessor product.  CMS stated, with emphasis in original, that AMP baseline data "is established *for each dosage form and strength* of the drug"—thus begging the fundamental question of whether Somatuline ED is the same "drug" as the predecessor product.

57.     CMS also suggested that the fact that Somatuline ED was approved by FDA under the same NDA number (*i.e.*, through sNDAs linked to the existing, approved NDA) further dictated that Somatuline ED be treated as the same drug as the predecessor product.

58.     As for the product changes cited by Ipsen in its letter, CMS stated that, while it "appreciate[s] the enhancements to the delivery mechanism, the new indications for the use of the product, the changes to the inactive ingredients, as well as the time, effort and financial support that went into the development of Somatuline ED[,] these factors do not meet the criteria for the establishment of new base date AMPs for the three strengths of Somatuline ED."

59.     On September 21, 2015, Ipsen sent a letter to HHS requesting that the agency reconsider CMS's decision reflected in Ms. Tuttle's email and recognize that Ipsen is entitled to establish new base date AMPs for its Somatuline ED products.

60.     Ipsen explained that CMS's refusal to recognize Somatuline ED as a new drug for purposes of the Medicaid rebate program was contrary to the SSA, which defines "covered outpatient drug" in terms of the FDCA's product approval provisions and makes clear that Congress intended CMS to look to the FDCA to resolve whether a new product is a new and different "covered outpatient drug" or, rather, the same drug as a predecessor product.

61.     Ipsen explained that, under the relevant FDCA provisions, Somatuline ED is clearly a "new drug"—not the same drug as the original Somatuline product.  Ipsen pointed to the several significant ways in which Somatuline ED differs from the predecessor product and

explained that those significant improvements are "major changes" as a matter of law that render Somatuline ED a "new drug" that required a new approval from FDA.  Ipsen also explained that FDA's recognition that Somatuline ED is entitled to both "new drug exclusivity" and orphan drug exclusivity underscores that Somatuline ED is not merely the same drug as the original Somatuline.  That Somatuline ED has the same dosage form and strengths of the predecessor product, Ipsen noted, does not mean that they are the same "drug."

62.     Ipsen also explained why CMS's rationale for rejecting new base AMPs for Somatuline ED is inconsistent with the SSA and basic requirements of reasoned decisionmaking.

63.     First, Ipsen explained that there is no basis in law or logic for CMS's position that only a new drug approved via a new NDA can qualify as a new drug for purposes of the MDRP. Federal law permits a manufacturer to proceed via either a new NDA or an sNDA to obtain FDA approval when making significant changes that render a product a new drug.  What matters under federal law is that "major changes" to a predecessor product create a "new drug" that, as such, requires a new approval from FDA.  Whether the manufacturer proceeds via a new NDA or via an sNDA is an entirely superficial and immaterial distinction that is unsupported by anything in the SSA or the FDCA.

64.     Second, Ipsen explained that CMS's emphasis on the fact that Somatuline ED shares the same dosage form and strengths as the predecessor product is flawed because the agency failed to apprehend that the threshold question is whether the products are even the same drug.  In focusing exclusively on the fact that AMP baseline data "is established *for each dosage form and strength* of the drug," CMS italicized the wrong language and missed the point:  The SSA's language concerning dosage forms and strengths means that a different dosage form or strength of *a given drug* is entitled to a separate base date AMP, but that does not mean that

*different covered outpatient drugs* must use the same base date AMP just because they happen to share the same dosage form and strength.  If two products are not the same drug, CMS has no authority to deem them the same "covered outpatient drug" for purposes of the MDRP.

65.     On August 3, 2016, Ipsen received a response to its letter from the Director of the Division of Pharmacy, the division within CMS that administers the MDRP, stating that HHS had asked the Division to respond on its behalf.

66.     In its response, CMS acknowledged that "section 1927(k)(2) of the [SSA] defines a 'covered outpatient drug' based on FDA approval," but claimed that there is no indication from Congress that FDA "approval status be used for determining whether a drug qualifies as a new drug for the purposes of price reporting for the MDRP."  CMS offered no analysis of how Congress indicated an intent for CMS to create an alternative framework for defining a new drug under the MDRP and no explanation of why Congress would have wanted CMS to create such a parallel-but-conflicting regime.  Rather, CMS merely asserted without any meaningful analysis that "[t]he reasons for requiring a new approval for a drug that has new marketing authority do not require different Medicaid pricing policies when the dosage form and strength are not changed."

67.     CMS also asserted that, because Somatuline ED was approved via an sNDA rather than via a new NDA, it must be treated as the same covered outpatient drug as the predecessor product.  CMS stated that "we consider a sNDA which contains the same 'route number' with an extension (indicating that it is a supplement to the NDA) to be approved under the same NDA, and such products should not have separate baseline data."  Once again, CMS did not point to anything in any statute supporting this dispositive distinction between the two pathways for approval of a new drug permitted under the FDCA.  Nor did CMS point to any rule

issued after notice-and-comment rulemaking that purports to interpret the SSA to authorize this distinction; CMS has not engaged in any such rulemaking.

68.     Instead, CMS relied only on "Manufacturer Release No. 26," a non-binding guidance document it had issued in February 1997.  That document addressed an entirely different situation, namely, when one labeler sells a drug to another labeler.  As noted, the first five digits of the NDC-9 code designate the labeler, so in this situation the new labeler uses a different NDC for the drug.  But the drug itself has not changed in any way.  Because the change in labeler does not change the drug itself, CMS declared that in this situation the new labeler is not entitled to establish a new base date AMP just because the new labeler uses a different NDC. Instead, "baseline information, such as Market Date and Baseline AMP[,] MUST follow the NDA of the product.  It does NOT follow the NDC of the product."

69.     Nothing in this Manufacturer Release addresses in any way the situation presented here, where a labeler makes major changes to a predecessor product that render it a new drug requiring a new FDA approval.  To the contrary, even CMS's regulation makes clear that drugs with different NDC-9s are "drugs of different types," not "the same drug."  42 C.F.R. § 447.502 (distinguishing between purchases "of the same drug, drugs of different types *(that is, at the nine-digit national drug code (NDC) level*) or another product" in addressing bundled sales) (emphasis added).  Perhaps the Manufacturer Release's view—that a drug that gets a new NDC-9 because it is sold to a new labeler remains the same drug for base date AMP purposes— is valid despite the regulation's language defining "drugs of different types" as drugs that have different NDC-9s.  But that can do nothing to support CMS's determination here, for Somatuline ED is a "new drug" as a matter of law that underwent multiple significant changes.

70.     In closing, CMS acknowledged "the enhancements to the Somatuline ED delivery mechanism; the new indications for the use of the product; the changes to the inactive ingredients; as well as the time, effort and financial support that went into the development of Somatuline ED," but reaffirmed its decision "that these factors do not warrant establishment of new base date AMPs for the three strengths of Somatuline ED."

## COUNT I

### Violation of the Administrative Procedure Act

71.     Ipsen incorporates the preceding paragraphs as if fully set forth herein.

72.     CMS's denial of Ipsen's request to recognize new base date AMPs for Somatuline ED is "final agency action for which there is no other adequate remedy."  5 U.S.C. § 704.

73.     The APA proscribes agency action that is "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law" or that is "in excess of statutory jurisdiction, authority, or limitations."  *Id.* § 706(2)(A) & (C).

74.     The SSA provisions governing the MDRP cross-reference and incorporate the FDCA drug approval regime.  The SSA does not create a parallel regime of its own for determining when changes to a drug render it a new and different drug or authorize CMS to create any such regime.  Nor has CMS promulgated a regulation that purports to create any such regime; to the contrary, its regulation treats different NDC-9s as denoting "drugs of different types."  42 C.F.R. § 447.502.

75.     CMS nonetheless has determined that drugs that qualify as "new drugs" under the FDCA must be treated as the same drug for purposes of the MDRP if the manufacturer obtained FDA's approval to market the new drug via an sNDA rather than a new NDA.  That determination is contrary to law and in excess of CMS's authority because Congress did not

authorize CMS to create its own parallel-but-conflicting regime for deciding what qualifies as a new drug.

76.     CMS's determination is also arbitrary and capricious.  Even if CMS had authority to disregard the FDCA and create its own conflicting regime (which it does not), it would be arbitrary and capricious to make a new drug's eligibility for a new base date AMP turn on whether the manufacturer obtained the required FDA approval via a new NDA or via an sNDA. That distinction is utterly untethered to anything in the SSA, and it makes no sense to make that distinction dispositive when the FDCA and FDA regulations authorize manufacturers to proceed via either pathway.  CMS's seizing on this distinction to penalize Ipsen is especially arbitrary and capricious given that FDA often encourages manufacturers to proceed via an sNDA for efficiency reasons and Ipsen had no prior notice of CMS's interpretation, as it has never been the subject of notice-and-comment rulemaking or otherwise publicly articulated (and in fact is contrary to CMS's regulation, 42 C.F.R. § 447.502).

77.     At the very least, CMS's determination is arbitrary and capricious because CMS failed to offer a reasoned explanation for why it adopted its rule—*i.e.*, what valid purpose could be served by treating identically-situated companies differently simply because one submits a new NDA while the other submits an sNDA—and failed to address Ipsen's arguments in any meaningful way.

**PRAYER FOR RELIEF**

WHEREFORE, Ipsen requests that this Court enter judgment in its favor and:

A.      Declare that CMS's determination that Ipsen is not entitled to establish new base date AMPs for Somatuline ED is arbitrary and capricious, an abuse of discretion,

and otherwise not in accordance with law, and in excess of CMS's statutory jurisdiction, authority, and limitations;

B.      Vacate and set aside CMS's determination;

C.      Enter a permanent injunction restraining Defendants from enforcing, applying, or implementing CMS's determination;

D.      Award Ipsen its litigation costs and reasonable attorneys' fees; and

E.      Order such other relief as the Court may deem just and proper.

Respectfully submitted,

/s/  Jeffrey S. Bucholtz
_____
Jeffrey S. Bucholtz
  D.C. Bar No. 452385
John Shakow
  D.C. Bar No. 451429
Preeya Noronha Pinto
  D.C. Bar No. 995159
Nikesh Jindal
  D.C. Bar No. 492008
KING & SPALDING LLP
1700 Pennsylvania Ave., NW
Washington, D.C. 20006
Telephone:  (202) 737-0600
Facsimile:  (202) 626-3737
jbucholtz@kslaw.com
jshakow@kslaw.com
ppinto@kslaw.com
njindal@kslaw.com

Dated:  December 5, 2016